IN THE MATTER OF JOHN M. SKEVIN, AN
ATTORNEY AT LAW.

Argued September 8, 1986—Decided November 14, 1986.

*Thomas J. McCormick,* Assistant Ethics Counsel, argued the cause for Office of Attorney Ethics.

*Leon J. Sokol* argued the cause for respondent (*Greenstone & Sokol,* attorneys; *Michael C. Urciuoli* and *Frank A. Campana,* on the brief).

PER CURIAM.

This case arises from a report and recommendation of the Disciplinary Review Board (DRB) that respondent be disbarred. The Board's report follows the finding of a Special Master appointed to make a factual record with respect to certain charges of ethical misconduct that had been made against respondent. We find, as did both bodies, that the record demonstrates by the required standard of clear and convincing proof, that violation of the tenets of *In re Wilson,* 81 *N.J.* 451 (1979), has been shown and that under those principles the conduct must result in disbarment.

## I.

Because of the paramount importance of the *Wilson* issue, we shall but briefly detail the other ethical matters that were heard, since the findings on none would have merited disbarment. We shall refer to the matters by the count numbers in the Second Amended Complaint that formed the basis of the hearing below.

Count One, the *Dodd* matter, involved a dispute regarding the handling of a real estate matter by Mr. Skevin. He represented the Dodds as purchasers in a substantial commercial transaction. Since certain title problems remained at the closing, he held a $35,000 escrow. He released $20,000 to the sellers approximately two weeks after the closing. He was deficient in recording the deed and mortgage, apparently due to a breakdown in his office management. A purchase money mortgage was not recorded for almost two months after the

closing. He did not properly resolve the various tax and title problems that caused the escrow to be set up.

As a result of these various delays, when his client sought to "flip" the property through quick resale, title problems arose that occasioned delay and caused the Dodds' attorney on the resale to set up a $10,000 escrow to clear the matters. The client complained that Mr. Skevin turned over the $20,000 from the escrow to the seller without satisfactory clearance from the title company. But the Special Master found, and we agree, that the disbursements to the seller, as well as additional disbursements to the Internal Revenue Service, the municipal tax office, and the State of New Jersey Division of Taxation, were appropriate payments to be made from the escrow account. After these disbursements, however, Mr. Skevin was still responsible for a balance of at least $7,654 from the $35,000 escrow account. Examination of his accounts disclosed that during the requisite period between the closing and the satisfaction of the escrow items, there was a shortage in Mr. Skevin's trust account. As late as June 8, 1982, the trust account balance was $4,367, an amount less than the $7,654 necessary to cover the balance of the escrow. It is this latter point that we shall address in the consideration of the *Wilson* violations.

But as to the other claims, we agree with the finding of the Master that the failure to record the deed and purchase money mortgage promptly was a matter of professional neglect that would not have warranted a disciplinary action. The payments made by Mr. Skevin from the account were justified. The requirement of a $10,000 escrow account was something for which Mr. Skevin was not directly responsible and the proofs are lacking that any improper conduct of Mr. Skevin caused his client to participate in the $10,000 escrow on the resale.

Count Two of the complaint dealt with the *Schrader* matter, the complaint that appears to have generated the most controversy. The case involved a personal injury matter that Mr.

Skevin handled on behalf of his client, John Schrader. Schrader had suffered multiple injuries and one of his legs had to be amputated below the knee. Mr. Skevin had done considerable legal work for the parents and was retained to represent John. Suit was brought and on November 1, 1982, the case was settled for a total of $250,500 with several defendants contributing to the settlement. Payments came in at various intervals, beginning in November of 1982 and ending with final payment on January 25, 1983. The total fee allowable to Mr. Skevin was $57,094.

The ethics complaint grew out of a dispute between the Schrader family and Mr. Skevin as to what his fair charges should have been. The Schraders had asked for an accounting before the March 1, 1983 filing of the ethics complaint. Eventually, the Schraders obtained their own attorney, and as a result of those communications a formal accounting was rendered on April 20, 1983. The key ethical allegations here are that Mr. Skevin delayed the accounting, wrongfully withheld funds due to his clients, improperly made advances both to himself and his client prior to the receipt of the settlement funds, sought unlawfully to extract payments from the clients out of the settlement proceeds, and illegally endorsed one of the settlement checks in the matter.

On the substantive contentions, the Master found that Mr. Skevin had at least an arguable claim to a portion of the proceeds that were due to him from other matters of the Schraders. Some amounts of this claim were eventually determined through arbitration between the Schrader parents and Mr. Skevin, others through release. The Master further found that the evidence was inconclusive with respect to whether there was oral authorization by John Schrader to sign the settlement check. The Master stated that the delay caused in settling this matter was not caused by any fraudulent claim by Mr. Skevin and concluded, "[h]e thought, rightly or wrongly, that he had a claim to be so compensated. Events subsequent to the accounting of April 20, 1983 should be treated as a

business dispute, rather than a question of Disciplinary Rule violation."

Of course, the Master found that the advances to Mr. Schrader prior to the receipt of the settlement funds were inappropriate and unauthorized. But the Master said:

> The conclusion is that the loans [made to the client and the withdrawal of fees and disbursements before receipt of the settlements funds] represent a misuse of funds held in trust for clients other than Schrader, or use of personal funds that should not have been commingled with clients' trust monies or a combination of the two * * * * [but] that the unethical conduct represented by the loans made to the client is conduct for which a private reprimand would constitute adequate discipline.

Count Three, the *Onello* matter, involved a complaint of unethical conduct by Joseph Onello, a former business partner and client of Mr. Skevin. He complained of Mr. Skevin's handling of a real estate transaction in which Mr. Skevin acted as attorney for the joint venture with Onello. The complaint was primarily based upon Mr. Skevin's failure to get the sellers' taxes assessed and paid promptly and on his failure to record the deed and mortgage promptly. This closing also involved a $10,000 escrow account to be held in Mr. Skevin's trust account pending clearance by the sellers of certain tax liens clouding the title. Shortly after the closing, Mr. Onello bought out Mr. Skevin's interest in the property. On June 1, 1983, Mr. Onello attempted to withdraw his complaint; the District Ethics Committee nevertheless chose to pursue the matter.

There were difficulties with respect to the transaction. It was not until October 10, 1983, some 19 months after the closing, that Mr. Skevin was permitted by the seller's attorney to release the funds. On this matter, the Master recommended dismissal of the substantive charges subject to his observation that although it was clear that Mr. Skevin was to maintain a $10,000 escrow account, the entire balance in the trust account fell below $10,000 during a number of intervals in the fall of 1983 between the closing date and the paying out of the $10,000. Money that should have been kept in the trust ac-

count to serve as the $10,000 escrow fund was used for purposes not related to the joint venture.

Count Seven, the *Santana* matter, involved an inappropriate advancement of settlement proceeds to an indigent client. The making of loans while the case was pending was a violation of DR 5–103(B) (now RPC 1.8(e)), but the Master believed the matter could have called for a private reprimand.

Count Eight of the complaint referred to a number of matters dealing with failure to obtain fee agreements, failure to advise of alternate fees, or miscalculation of contingent fees. All of these were dismissed by the Master. Count Nine of the complaint dealt primarily with overdrafts in Mr. Skevin's business and personal accounts, matters that were characterized by the presenter as "de minimis" and would not have warranted disbarment. There was, however, an admitted allegation with respect to a trust fund check being dishonored for insufficient funds but which respondent reissued with adequate funds available.

## II.

Our central focus must be on Counts Four, Five and Six of the superseding complaint that the Office of Attorney Ethics served upon the respondent. These counts charge that respondent *knowingly* misused client trust funds, did not maintain separate accounts for trust and business records, did not maintain contemporaneous trust account records as required by Rule 1:21–6 for 1982 and 1983, and extensively commingled clients' funds with his own. For the purpose of simplicity, Counts Four, Five and Six will not be treated separately given the similarity of the allegations and ethical misconduct. The background to these charges is that in investigating the complaints of *Dodd, Schrader* and *Onello*, the Office of Attorney Ethics caused an audit to be made of respondent's financial affairs. During the course of that audit it was learned that

respondent had for several years commingled personal and client funds in his attorney trust account.

This practice clearly violates Rule 1:21–6, which provides in pertinent part:

Every attorney who practices in this state shall maintain in a financial institution in New Jersey * * *:

(1) a trustee account or accounts, separate from any business and personal and from any fiduciary accounts * * *, into which trustee account or accounts funds entrusted to the attorney's care shall be deposited; and

(2) a business account into which all funds received from professional services shall be deposited.

Other than fiduciary accounts * * *, all trustee accounts, whether general or specific, as well as all deposit slips and checks drawn thereon, shall be prominently designated as an "Attorney Trust Account."

The conduct also violated Disciplinary Rule 9–102(A), in force during the relevant years, which stated that escrow funds of clients paid to the lawyer had to be maintained in identifiable accounts separate from the attorney's business account. Present Rule of Professional Conduct 1.15(a) essentially restates this mandate. Further investigation disclosed that respondent's accounts were apparently "out of trust" over an extended period of time in 1982 and part of 1983.

Because of concern for clients' funds, the Office of Attorney Ethics (OAE) petitioned for immediate temporary suspension of respondent pursuant to Rule 1:20–4(g) in March 1984. In support of that application the OAE submitted the investigation and audit of its accountant, Louis Brief, which disclosed that in addition to the lack of contemporary trust account records, the reconstructed records showed substantial deficits in respondent's trust balances, ranging from $12,469 in June 1982 to $133,476 in December 1982. Specifically, the evidence contained in Exhibit C–105 showed that respondent was out of trust as follows:

June 1, 1982 ............................ $ 12,469.99
July 1, 1982 ............................ 70,267.31
August 1, 1982 .......................... 72,252.18
September 1, 1982 ....................... 65,618.20
October 1, 1982 ......................... 92,552.27
November 1, 1982 ....................... 114,704.29
December 1, 1982 ....................... 133,476.40

The respondent denied that he had knowingly misused clients' funds, noting that he had deposited close to $1 million of personal funds in the account during the relevant periods of time, which would have, he thought, been sufficient to cover any personal withdrawals from the account. His accountant factually disputed the contentions of the OAE's accountant that there was a deficit in his account in excess of $133,000 as of December 1982. At this point, respondent's accountant said that the deficit was far less and was the result of mere inadvertence in handling the account. With the central matter of knowing misappropriation being in dispute and believing that the public interest could be protected by permitting the proofs to be resolved before terminating respondent's practice, the Court denied the petition so long as the accounts were supervised under proctorship to be regularly reviewed in the disciplinary process.

Resolution of the disputed issues required a fuller examination of respondent's books of account and extended study of the many transactions that occasioned the charge of misuse of trust funds. A broadly experienced retired trial judge was selected as Master to conduct that factual hearing. At the hearing, respondent stipulated to many of the basic underlying facts, particularly the basic facts concerning the *Dodd, Schrader* and *Onello* matters. Some concern has been raised that certain claimants in those matters were precluded from offering personal testimony with respect to the matters in issue after apparently receiving subpoenas to testify. We believe that oral proof would not have aided the Master in resolution of

the disputed issues and we are satisfied that the proofs would not have been dispositive as to the ultimate proceedings. Further proof as to the allegedly unauthorized signature to the settlement check would not have altered the result significantly since the question turns not on the receipt of the funds but the ultimate disposition of the funds, a matter disclosed by the record. We regret the misunderstanding that occasioned the clients to believe that their evidence was wrongly withheld; perhaps more care should be taken to explain the meaning of stipulations to the aggrieved parties.

For the reasons that we shall later state in more detail, respondent has conceded that there were undoubtedly occasions when clients' funds had been used because the outstanding balances in the trust account were insufficient to cover the amounts that were admittedly due to clients. The exhibits and testimony before the Master clearly and convincingly demonstrate the basic facts with respect to the commingling of clients' funds with personal funds, the lack of required record-keeping on respondent's part, and the existence of actual deficits in the trust account. The respondent's expert eventually recognized that the shortfall in December 1982 had to be at least $105,000. Specifically, as noted, the *Dodd* deficit was $3,287 on June 8, 1982.

The key issue that the Master and the DRB had to resolve was whether the shortages were the result of knowing misuse or were the product of inadvertent error or neglect in the handling of funds. In our decisions, we have not extended the *Wilson* sanction to such instances of limited, inadvertent and unintentional misuse of clients' funds. *In re Hennessy*, 93 *N.J.* 358, 361 (1983) ("no intentional use of funds belonging to others" warrants public reprimand); *In re Noonan*, 102 *N.J.* 157 (1986) (gross negligence insufficient to warrant disbarment where attorney did not know client's money misappropriated).

The Master concluded that this case did not fall into the pattern of those cases. The marshalled evidence that distin-

guishes this case from those was that respondent clearly knew that he was withdrawing clients' funds from commingled accounts on each occasion when he drew his own fees or disbursements in advance of receiving settlement checks. Exhibit C-101 before the Master disclosed specific instances of plaintiff's personal injury practice in which respondent reimbursed himself for fees and costs by withdrawing funds from his trust account before settlement proceeds were received. The time periods were sometimes substantial, as long as months between the advance to himself and the receipt of the settlement checks. The amounts were also substantial, ranging from hundreds of dollars to thousands. These two facts lead to the unavoidable inference that respondent knew that he was endangering other clients' funds that were in the commingled account. The same exhibit, C-101, also disclosed that respondent rarely distributed funds to clients before settlements proceeds were received. But when it happened, he had to know that an unauthorized withdrawal from a commingled account was occurring.

Both of these practices were highlighted in the *Schrader* case. Respondent, although knowing that he had not yet received the settlement proceeds, undertook to draw on the uncollected and, indeed, unreceived funds admittedly for the client but also for his own account. In doing so, he knew that he was invading the trust account that by his own admission contained both clients' funds and personal funds. Had respondent maintained a separate, personal account for such purposes, his position might be defensible. But respondent candidly admitted he just assumed there was enough money in the trust account to handle the trust disbursements. It is also undisputed that he did not maintain an accounting or running balance of his own funds in the trust account. Hence, it follows that each such advance posed an at least realistic likelihood of invading the accounts of another client since respondent had no way of knowing what the balances were. *Cf. In re Fleischer*, 102 *N.J.* 440, 447 (1986) (while poor accounting does not establish a

knowing misappropriation, poor accounting is not a *Wilson* defense if evidence indicates knowing misappropriation).

While such evidence might not sustain a finding of criminal intent to deprive others of their funds, the evidence clearly and convincingly demonstrates that defendant knew the invasion was a likely result of his conduct, a state of mind consistent with the definition of knowledge in our statute law. *N.J.S.A.* 2C:2–2b(2). The concept arises in a situation where the party is aware of the highly probable existence of a material fact but does not satisfy himself that it does not in fact exist. "Such cases should be viewed as acting knowingly and not merely as recklessly. The proposition that willful blindness satisfies for a requirement of knowledge is established in our cases." 2 Final Report of the New Jersey Criminal Law Revision Commission, *The New Jersey Penal Code*, 44 (1971) (commentary) (citing *State v. Jusiak*, 16 *N.J.Super.* 177, 181 (App.Div.1951); *State v. Loomis*, 89 *N.J.L.* 8 (Sup.Ct.1916); *accord Model Penal Code and Commentaries* (Official Draft and Revised Comments) § 2.02(7), 248 (comment) (1985).

Further confirmation for the finding, as set forth by the Master, is in his analysis of the 1983 deficits related to the *Dodd, Schrader* and *Onello* matters. It is undisputed that the respondent had to make a $25,000 loan to the trust account on March 16, 1983, for the purpose of paying Schrader an additional $25,000 on his award. Respondent was thus personally aware on that date that his handling of the trust account had produced the deficit result. Notwithstanding that knowledge, respondent continued to withdraw funds and the account remained in a deficit state in 1983 in that the $10,000 due to Onello did not remain intact in the account. *Exhibit C–93*, statement dated 3–31–83. As noted, the Onello closing took place on March 5, 1982, but the final disposition of trust proceeds did not take place until October 10, 1983. Respondent admitted that he was the only person with any real authority over or supervision of the account. Although some administrative duties were entrusted to his secretary, she was not asked

to balance the account, nor did she see the trust account bank statements. Hence, we must concur with the Master that

> [t]he finding is that he knew in 1982 and 1983 of the deficit condition of his trust account and knew that the condition had been produced, and was being continued, by writing checks against trust accounts that should have remained untouched until used for the purposes for which they had been entrusted to him.

But again, respondent's prior handling of the trust account, even without this additional evidence, would have been sufficient to prove by clear and convincing evidence a knowing misappropriation.

### III.

Although we have concluded that the *Wilson* sanction must be invoked here, there is an aspect to this case that deeply troubles us. Respondent moved before the Master to dismiss the proceedings in whole or in part because of the apparently deliberate breach of the confidentiality of the disciplinary proceedings. The Master ruled that if only individual parties were involved, dismissal might be appropriate; but the fact that there was a public interest involved tipped the balance so as to preclude dismissal. We agree.

We have taken extraordinary steps to protect the public interest in ethics disciplinary proceedings by affording to litigants who respect its confidentiality an immunity from suit for malicious prosecution. *R.* 1:20–11(b); *In re Hearing on Immunity For Ethics Complainants,* 96 *N.J.* 669 (1984). In exchange, we insist only that the parties who invoke the disciplinary process respect its concept of confidentiality until a finding is made. We do this because we believe that in balancing the interest in vindicating client's rights with an attorney's professional reputation for integrity, we must recognize that even an unsubstantiated charge can, if misunderstood, do irreparable damage to an attorney without any corresponding public benefit. The record in this case demonstrates the result of such unauthorized disclosures. The evidence testified to by Mr. Skevin is that he suffered a serious decline in his professional

practice while these proceedings were pending. With the exception of the *Wilson* violations, almost all of the matters complained of were resolved in a manner that almost certainly would not have resulted in disbarment or serious discipline. The circumstances thus demonstrate how an attorney may be tried and convicted, before the facts are known, through manipulation of events outside the hearing room. In almost all of the matters the clients complained of, respondent's deficiencies were either disproven or were not of ethical gravity. We cannot expect those not directly concerned with the administration of justice to share our concern for a fundamental fairness that would insist on respecting the peculiarly sensitive nature of these proceedings; still, we should take steps to guarantee that fairness against abuse.

■ Though it would be of no benefit to respondent now, others may be protected from such unfairness by our insistence upon respect for the confidentiality rules and a clear understanding by *any participant* in the process that he will not only forfeit any immunity from just prosecution for malicious abuse of the process, but that should he violate the rules of the disciplinary process he should expect that the sanctions of the law would be invoked.

Finally, we must advert to the extraordinary suffering that this individual respondent has incurred. We note the ravaging diseases that afflicted his mother, his son, and his sister, the consequences of which contributed to the decline of his marriage, and the breakup of his family, as well as his own personal health problems. They cannot be ignored. There is a limit to the ability of any human to cope with such adversity. This is a tragic end to the only partially fulfilled promise of a public servant and counsellor. In the matter most grievously complained of, the *Schrader* matter, it appears that the respondent obtained a significant award for this young accident victim in gaining the $250,500 settlement. It has been urged that his advancement of the client's funds was motivated by a desire to

help his client overcome the adversity that arose from the client's disagreement with his own family over a marriage that resulted in the client being out of his house with no place to live. The same motives apparently prompted the handling of the *Santana* matter. This young man was apparently alone and unaided in the community and relied upon respondent for more than legal advice. There is no venality in that conduct.

We recognize the human suffering occasioned by the almost inflexible invocation of the *Wilson* standard. But we have been unable to rationalize the qualitative differences that would excuse the violation in the case of one suffering disease or defeat, or one suffering from drugs or other dependency from one suffering the anguish of collapsing home life or marriage due to economic or other strains. Consequently, we have chosen to resolve the choice of professional discipline by maintaining our primary focus on the public interest. In doing so, we have been compelled to apply the *Wilson* sanction to attorneys of unblemished record whose misuse of funds had not injured clients, *In re Lennan*, 102 *N.J.* 518 (1986), and to attorneys who had devoted considerable amounts of their practices and lives to helping needy litigants. *In re Brown*, 102 *N.J.* 512 (1986). We do so here.

The judgment is that respondent be disbarred.

We further direct respondent to reimburse the Ethics Financial Committee for costs.

*For disbarment*—Justices Clifford, Handler, Pollock, O'Hern, Garibaldi and Stein—6.

*Opposed*—None.

## ORDER

It is ORDERED that JOHN M. SKEVIN of HACKENSACK, who was admitted to the bar of this State in 1956, be disbarred

and that his name be stricken from the roll of attorneys of this State, effective December 1, 1986; and it is further

ORDERED that JOHN M. SKEVIN be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.