657 A.2d 1197

IN THE MATTER OF DENNIS M. BARLOW,
AN ATTORNEY–AT–LAW.

Argued January 30, 1995—Decided May 19, 1995.

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Dennis M. Barlow* submitted a letter in lieu of brief, *pro se.*

PER CURIAM.

Following an audit performed in the summer of 1991 by the Office of Attorney Ethics (OAE), the District XIV Ethics Committee (DEC) filed a three-count complaint on December 31, 1992, charging respondent, Dennis M. Barlow, with record-keeping violations, gross neglect in failing to safeguard client funds, and knowing misappropriation of client funds. Respondent does not dispute the first two charges, but argues that the OAE has failed to prove by clear and convincing evidence that he knowingly misappropriated client funds.

The charge of knowing misappropriation arises from two real estate transactions: the *Spindel/Prehodka* and *Giordano* matters. In both matters, respondent failed to disburse properly clients' funds in respondent's trust account. Instead, he drew a check to himself in the amount of $2,894.94 although he knew these funds should be used to pay unpaid invoices for title insurance and surveyor's fees. The Special Master found that respondent's misappropriation was knowing. The Disciplinary Review Board (DRB) divided on the issue. Our review of the

record leads us to conclude by clear and convincing evidence that respondent knowingly misappropriated clients' funds.

The DRB summarized the relevant facts:

*THE SPINDEL/PREHODKA AND THE GIORDANO MATTERS* (knowing misappropriation)

Respondent represented Karen Spindel and Gregory Prehodka in the purchase of residential real estate from Blanche Goldstein. The closing on the property occurred on November 1, 1988. On or about that date, respondent deposited into his trust account the sum of $368,452.72. Thereafter, respondent made several disbursements from those funds between November 2, 1988 and April 12, 1989. After the disbursements, the trust account had a balance of $1,809 to the credit of the purchasers. In fact, a review of the Uniform Settlement Statement ("RESPA") disclosed that the sum of $1,889 should have remained on deposit for the payment of title insurance ($1,589) and surveyor's fees ($300). The $80 shortage was attributed to an overpayment to the Passaic County Register for realty transfer tax. That overpayment is not the subject of any disciplinary charges.

Respondent also represented John and Joanne Giordano in the refinancing of their mortgage. Closing in that matter occurred on October 31, 1988. Respondent received and deposited into his trust account the sum of $79,140.63. Thereafter, respondent made several disbursements between November 4, 1988 and March 13, 1989. After those disbursements, a balance of $1,085.94 remained in the trust account to the credit of the Giordanos. In fact, the RESPA statement shows that the sum of $1,144 should have remained on deposit for the payment of title insurance ($794) and surveyor's fees ($350). The $58.06 shortage, attributed to a computational error, is not the subject of any ethics charges.

As of April 12, 1989—respondent had not paid either the title insurance or the surveyors' fees relative to the *Spindel/Prehodka* and *Giordano* matters. As of that date, thus, there should have remained in respondent's trust account the sum of $2,894.94 attributable to those clients. Nevertheless, on April 12, 1989, respondent drew to himself trust account check No. 654 in the amount of $2,894.94, the exact amount that should have remained on deposit in those two matters. Respondent then deposited that check (as cash) into his business account on or about April 14, 1989, as part of a total deposit of $2,969.94. The memo portion of that check identified those client matters as the source of the funds. Prior to that deposit, respondent's business account had been overdrawn by $186.66. The deposit brought respondent's account into a positive position. In addition, from April 15, 1989 through May 3, 1989, respondent used these funds to pay other business and personal expenses. On May 3, 1989, after a check payable to Marina Associates (a casino) was presented for payment against the business account, the account was returned to a negative balance status.

Eventually, respondent paid the title insurance and survey invoices, using other funds. On June 14, 1989, seven and one-half months after the *Giordano* closing, he paid the NIA Title Agency invoice. The actual amount of that invoice was $594, not the $794 respondent had charged to his clients, pursuant to the RESPA statement. When respondent paid the NIA invoice, he paid the correct lower

amount and failed to refund the $200 surplus to his clients. He paid the surveyor's bill in the *Giordano* matter on March 9, 1990, after the surveyor obtained a judgment against him.

Respondent paid NIA Title Agency's invoice in the *Spindel/Prehodka* matter on January 19, 1990, fourteen months after the claim. He paid the surveyor, Ferwerda, on November 16, 1992, four years after the closing.

[Exhibit references omitted.]

The DRB unanimously found by clear and convincing evidence that respondent had violated *RPC* 1.15(d) (record-keeping violation), *RPC* 1.1(a) (gross neglect), and *RPC* 1.3 (lack of diligence). However, the DRB divided on the issue of knowing misappropriation. Three members of the DRB found that the misappropriation was knowing and, therefore, recommended disbarment. Two members recommended a two-year suspension, and one member recommended a six-month suspension. Three members did not participate.

The member recommending a six-month suspension found that the misappropriation was not knowing. In that member's view, the appropriated funds were not client funds, but reimbursements by clients to respondent for costs for which he was personally liable. That member reasoned that the funds advanced by respondent's clients were not trust funds, and that respondent need not have segregated them in his trust account. The member further theorized that even if respondent did not have actual legal authority to deposit those funds into his business account, his honest, albeit mistaken, belief that he could transfer them to that account precluded a finding that his misappropriation was knowing. In addition, that member believed that respondent simply forgot to pay the outstanding bills after transfer of the monies from his trust account to his business account, and that respondent did not intend to use the transferred funds for personal expenses.

The two members recommending a two-year suspension indicated that they were not convinced that the OAE had sustained its burden of proving by clear and convincing evidence that respondent had knowingly misappropriated client funds. Those members believed that the proofs do not exclude the possibility that because of shoddy bookkeeping, respondent inadvertently used the

funds for his own benefit. Thus, they found that respondent should not be disbarred for negligent misappropriation.

–A–

■ We have consistently held that "disbarment is the only appropriate discipline [for knowing misappropriation of client funds]." *In re Wilson,* 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979). In *Wilson,* we declared that "all ... cases [involving knowing misappropriation] shall result in disbarment." *Ibid.* When announcing this rule, we stated that there were "no significant exceptions to this rule...." *Ibid.* Even when the lawyer "borrows" without permission rather than steals, we have invariably imposed disbarment rather than a lesser sanction. *Id.* at 455 n. 1, 409 *A.*2d 1153. Misappropriation "includ[es] not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *Ibid.*

The *Wilson* rule is harsh. We have justified its harshness because of the paramount need to preserve public confidence in the integrity of the bar. *Id.* at 461, 409 *A.*2d 1153. Since we rendered the *Wilson* opinion, we have not retreated from the strict rule that knowing misappropriation of client funds almost invariably warrants disbarment of an attorney. *See, e.g., In re Davis,* 127 *N.J.* 118, 603 *A.*2d 12 (1992); *In re Bell,* 126 *N.J.* 261, 596 *A.*2d 752 (1991); *In re Sommers,* 114 *N.J.* 209, 553 *A.*2d 789 (1989); *In re Warhaftig,* 106 *N.J.* 529, 524 *A.*2d 398 (1987); *cf. In re Siegel,* 133 *N.J.* 162, 170, 627 *A.*2d 156 (1993) (disbarring lawyer for knowing misappropriation of law firm partnership funds); *but cf. In re Peterman,* 134 *N.J.* 201, 209, 632 *A.*2d 271 (1993) (certifying applicant's admission to state bar despite applicant's prior knowing misappropriation of client funds while practicing in another jurisdiction). We have disbarred attorneys despite evidence of compelling mitigating factors. *See, e.g., In re Steinhoff,* 114 *N.J.* 268, 553 *A.*2d 1349 (1989) (drug dependency); *In re Nitti,* 110 *N.J.* 321, 541 *A.*2d 217 (1988) (compulsive gambling); *In re Skevin,* 104 *N.J.* 476, 517 *A.*2d 852 (1986) (family hardship), *cert.*

*denied,* 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L.Ed.*2d 526 (1987); *In re Lennan,* 102 *N.J.* 518, 509 *A.*2d 179 (1986) (same).

–B–

■ We have been equally resolute in requiring proof of respondent's state of mind by clear and convincing evidence. Proof of misappropriation, by itself, is insufficient to trigger the harsh penalty of disbarment. Rather, the evidence must clearly and convincingly prove that respondent misappropriated client funds knowingly. *See In re Moras,* 131 *N.J.* 164, 168–69, 619 *A.*2d 1007 (1993) (evidence that attorney wrote check for client on trust account against uncollected funds does not establish knowing misappropriation); *In re Konopka,* 126 *N.J.* 225, 233, 596 *A.*2d 733 (1991) (attorney's negligent misappropriation of client funds due to careless record-keeping does not mandate disbarment); *In re Goldstein,* 116 *N.J.* 1, 6, 560 *A.*2d 1166 (1989) (OAE failed to establish that respondent knew misappropriation of interest earned on trust funds was improper); *In re Hollendonner,* 102 *N.J.* 21, 29, 504 *A.*2d 1174 (1985) (OAE failed to prove by clear and convincing evidence that respondent invaded escrow funds with knowledge that use of funds was improper).

■ Knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986). In the present case, the evidence is clear and convincing that respondent knew that the misappropriated funds were client funds and that his clients had not given him permission to use these funds.

Respondent testified before the Special Master: "Were those balances belonging to these two clients [Spindel/Prehodka and Giordano]? Of course, they were."

On cross-examination, respondent again admitted to knowledge that he had disbursed client funds to pay for personal expenses:

Q. So those funds were then spent by you for your own purposes?

A. Yes.

Q. And these were client funds?

A. Well, a great deal of it was, yes.

Q. Okay. And you knew at the time that you made those disbursements that you were not entitled to use those client funds in that fashion?

A. Well, that's presupposing at the time the disbursements were made, and it was my knowledge and intent to spend the money[ ] I had taken from the trust account and put in the general account.

Q. Are you saying these checks were written inadvertently?

A. Not at all. Not at all.

Q. So you intentionally wrote those checks?

A. Absolutely. I've admitted that before.

Q. And intentionally wrote those checks on a balance which you knew was comprised of your clients' funds?

A. But that's not true.

Q. That's not true?

A. No, sir.

Q. You were not aware those were your clients' fund?

A. That's not true either. Of course I was aware they were my clients' funds.

Respondent's record-keeping, although egregiously haphazard, was not the cause of his misappropriation. He wrote a check to himself for $2,894.94, a sum exactly equal to the trust account balances for the *Spindel/Prehodka* and *Giordano* matters. Indeed, the check contains the notation "Prehodka/Giordano."

Respondent contends that he withdrew the $2,894.94 balance on April 12, 1989, and deposited the funds into his business account because he intended to pay outstanding invoices. Respondent, however, did not pay these invoices until months later. He paid the title company in the *Spindel/Prehodka* and *Giordano* matters in January 1990 and June 1989, respectively. He did not pay the surveyor in the *Giordano* matter until March 1990, after the debt had been reduced to judgment. Indeed, respondent did not pay the surveyor in the *Spindel/Prehodka* matter until November 1992.

Instead of timely paying the invoices, respondent used the funds to pay for personal expenses. On April 11, 1989, just before the

deposit of the check drawn on respondent's trust account, respondent was $186.66 short in his business account. From April 20 to May 3, respondent made several withdrawals and wrote a series of checks for personal expenses, including a $7,500 check to Marina Associates for a casino debt.

Moreover, the record clearly indicates that respondent knew, when he deposited these funds in his business account, that he was not entitled to disburse these funds to himself:

Q. Okay. You also knew at the time that you wrote that check that those funds for each of those two closings were earmarked for the payment of the title invoices and surveys?

A. Yes.

Q. Okay. And you also knew at the time that the check was written that those title invoices and surveys had not been paid.

A. Yes, sir.

Q. Okay. Knowing that, you nevertheless took those funds and deposited them into your business account?

A. Right.

Q. Okay. Now, you were not entitled to those funds at that time. Is that correct?

A. That's correct. Yes.

Q. Okay. Your clients had not given you permission to withdraw those funds, had they?

A. No.

Respondent's sole excuse for depositing those funds in his business account was that he intended to hide from his clients his failure to pay certain outstanding invoices. Although unable to explain why he did not pay those invoices immediately, respondent insists that he always intended to pay them after he transferred trust funds to his business account. Respondent insists that he never intended to keep those funds: "[I]t was never my intention to steal any funds from my client, to take $2,800 [sic] and not pay surveyors and not pay the title policies."

■■ Intent to deprive permanently a client of misappropriated funds, however, is not an element of knowing misappropriation. Nor is the intent to repay funds or otherwise make restitution a defense to the charge of knowing misappropriation. A lawyer who

uses funds, knowing that the funds belong to a client and that the client has not given permission to invade them, is guilty of knowing misappropriation. The sanction is disbarment.

█ Respondent points to several factors in mitigation: (1) no one was injured by his actions; (2) his prior professional record was unblemished; and (3) he honestly believed that his actions did not constitute knowing misappropriation. Regrettably, these factors are insufficient to warrant departing from the *Wilson* rule. Consequently, respondent must be disbarred.

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the costs of transcripts.

*For disbarment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **DENNIS M. BARLOW** of **NUTLEY**, who was admitted to the bar of this State in 1976, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **DENNIS M. BARLOW** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **DENNIS M. BARLOW**, pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that DENNIS M. BARLOW comply with *Rule* 1:20–20 dealing with disbarred attorneys;  and it is further

ORDERED that DENNIS M. BARLOW reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the costs of transcripts.