702 A.2d 1286

IN THE MATTER OF LEWIS B. FREIMARK,
AN ATTORNEY AT LAW.

Argued October 20, 1997—Decided December 5, 1997.

*Lee A. Gronikowski*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Kimberly A. Hintze* argued the cause for respondent.

PER CURIAM.

This disciplinary proceeding results from a random compliance audit of the trust funds of respondent, Lewis B. Freimark, by the Office of Attorney Ethics (OAE) pursuant to *Rule* 1:21–6(c). As a result of the findings of that audit, the OAE conducted a demand audit. The audits covered the period between April 30, 1990 through May 31, 1992. The audits disclosed, among other things, that respondent kept no client ledgers, that there was no reconciliation of respondent's trust account bank statements with a schedule of client balances, and that respondent had been out of trust numerous times.

The OAE moved for respondent's temporary suspension, which the Court denied. We, however, ordered that a proctor be appointed to supervise respondent's practice and gave the proctor exclusive check-signing authority over respondent's attorney accounts.

A Special Master recommended to the Disciplinary Review Board (DRB) that respondent be publicly disciplined for four counts of knowing misappropriation and one count of failure to notify the OAE of discipline imposed by the New York disciplinary authorities.

Respondent does not dispute that he misappropriated client funds, but asserts that the OAE failed to prove by clear and convincing evidence that he misappropriated those funds *knowingly*. Instead, respondent contends that the evidence establishes only that the misappropriations arose from his negligence, specifically from his deplorable and shoddy recordkeeping. The DRB unanimously disagreed and recommended respondent's disbarment. Our review of the record leads us to conclude by clear and convincing evidence that respondent misappropriated clients' funds knowingly.

## I

Respondent, a sole practitioner admitted to the bar in 1980, was charged with knowing misappropriation of four clients' trust funds: Snyder (First Count), Alongi (Second Count), Caso (Third Count), and Leon–Markov (Fourth Count).

### The Snyder Count

Respondent represented Arlene Snyder in a personal injury action. He received $8,750.00 in settlement proceeds in February 1990, which he deposited in his trust account. On his checkbook stub, respondent immediately recorded the resulting available balance ("250 + 8,750 = 9000"). Respondent then issued a check to himself for $3,800.00 and deposited that check into his personal checking account. According to the retainer agreement, respon-

dent was entitled to one-third of the settlement. He took approximately forty-three percent. In addition, he did not deposit the overdisbursed fee into his business account as required by *R.* 1:21–6.

Respondent then issued check number 1203, which, according to respondent's checkbook stub, was written for $1,000.00 to "Lewis Freimark—Dr. Viscounti on Snyder." The check, however, was not cashed by Dr. Viscounti. Instead, it was paid to respondent's order, who endorsed the check and deposited it in his personal account. The evidence supports the finding that respondent wrote the checkbook stub for check 1203 to give the erroneous impression that Dr. Viscounti's bill for client Snyder was being paid.

As a result of disbursing several other small checks in connection with the Snyder case, respondent overdrew his trust account by $30.49. He cured the overdraft by depositing $200.00 on March 26, 1990. From March 26, 1990 to April 30, 1990, respondent's trust account had no activity except for a monthly service charge of $13.89. That charge reduced the balance in the account to $164.44.

On May 4, 1990, respondent deposited $12,350.00 in his trust account for another client, Maria DesReis, who had no relationship to Snyder. On May 15, 1990, when the only funds in his trust account were the DesReis funds, respondent paid Dr. Viscounti $1,500 for "full payment of Arlene Snyder's bill."

In its decision, the DRB summarized respondent's explanation of his handling of the Snyder Account:

> In his answer, respondent conceded that he was entitled to no more than $2,916.67 by way of legal fees. He claimed, however, that he did not know that he should have calculated his fee over the net settlement, as opposed to the gross amount. *R.* 1:21–7(d). He professed no knowledge of the exact amount held at that time for the benefit of Snyder. He maintained that, because his books and records were not regularly reconciled, he was unaware of the overdraft in his trust account caused by the $1,000 check to himself. Respondent stated his belief that the funds had been paid over to Dr. Viscounti, but could not recall how or when. Respondent testified as follows:

> I can say that this check here was written to me. There's a reference that it was for Dr. Viscounti. Beyond that, I don't know. And this check was deposited into one of my accounts.
>
> According to respondent, he was not even able to ascertain the amount of Dr. Viscounti's bill or how it was paid because of the poor records contained in the *Snyder* file. Respondent added that he did not keep a ledger card for the *Snyder* file. Respondent denied that he intentionally issued a check for $1,500 to Dr. Viscounti only after he had another client's funds deposited in his trust account, namely the *DesReis* funds. Respondent argued that he had made a mathematical error in the calculation of the amount payable to Snyder from the property settlement claim. In short, respondent contended, his actions in the *Snyder* matter were unmarked by any knowledge or intent to misuse trust funds and, therefore, not a knowing misappropriation.

From a settlement of $8,750, respondent made checks totaling $10,883.24, of which he deposited 4,800 into his personal checking account. Those facts, combined with the minimal activity in respondent's account following his deposit of $200 to cover the overdraft, and respondent's deposit of another client's funds just prior to the final withdrawal to pay Dr. Viscounti, convince us that respondent knowingly misappropriated trust funds in connection with the Snyder case. His actions constitute violations of *RPC* 1.15 (knowing misappropriation of trust funds), and *RPC* 8.4(c) (dishonesty, fraud, deceit or misrepresentation).

## The Alongi Count

Respondent received $7,000.00 in settlement proceeds for a personal injury matter in which he represented Amanda Alongi and deposited the proceeds in his trust account on December 28, 1990. The deposit brought his trust account balance to $54,560.14, of which $47,498.52 belonged to another client, Lamberti. Immediately, respondent disbursed one-half of the Alongi settlement, $3,500.00, to himself. Respondent not only overdisbursed the fee to himself as he had in the Snyder case, but also deposited the overdisbursed fee directly into his personal account; this time, respondent deposited the funds to cover a shortage of $250.97.

Although only $3,500.00 remained on the Alongi ledger, respondent drew two checks totaling $4,733.06: check number 1221 to On–Time Court Reporters and check number 1222 to the Clerk of

Middlesex County, which resulted in a negative Alongi balance of $1,233.06 and, consequently, an invasion of Lamberti's funds. During this period, respondent had no activity besides the Alongi and Lamberti matters in his trust account.

From February 5, 1991 until May 1, 1992, despite the fact that there were simply no funds on deposit for Alongi, respondent issued five checks to himself for a total of $3,800.00 in legal fees for the Alongi case. Respondent, therefore, kept $8,100 in fees against a $7,100 settlement.

The DRB summarized respondent's explanation of his handling of the Alongi Account:

> In his defense, respondent alleged that, during the course of the *Alongi* litigation, he had advanced monies for costs and expenses on behalf of Alongi and that, on one occasion, Alongi had requested a loan from him against the settlement proceeds. Respondent added that Alongi had authorized him to take one-half of the settlement proceeds as his fee. He claimed that, at the time that he wrote the checks to "On Time Court Reporters" and "Middlesex County Superior Court," he believed that there were sufficient monies on deposit to cover them. He blamed his lack of records for this erroneous belief. In short, respondent contended that he was unaware of the account balance and that, therefore, the invasions of other client funds were not knowing because he "at no time harbored the specific intent required to knowingly misappropriate funds."

In its decision, the DRB found knowing misappropriation in the *Alongi* matter:

> [A]s the special master noted, even if Alongi had given respondent authority to keep the entire proceeds of the settlement for his fees and advanced expenses, there is no explanation for respondent's invasion of other client funds to pay for respondent's fees in *Alongi*. All in all, respondent kept $8,100 for himself as fees ($3,500, $800, $700, $2,000, $300, $400 and $400). He could not reasonably have expected to be entitled to $8,100 against a $7,000 settlement. The only explanation respondent offered was that he believed that there were enough funds in the *Alongi* account to cover the withdrawals and that he was unaware of the account balance because of poor records. Such alleged belief was against reason, however. Again, basic arithmetic had to make respondent aware that he was improperly overdisbursing funds for his personal benefit. Here, too, the evidence against respondent is so overwhelming as to support a finding of knowing misappropriation on his part by clear and convincing evidence.

Based on our *de novo* review of the record, we agree and find that respondent violated *RPC* 1.15 (knowing misappropriation of

funds), and *RPC* 8.4(c) (dishonesty, fraud, deceit or misrepresentation).

### *The Caso Count*

In 1990, respondent represented George P. Caso in connection with a property damage claim. On August 14, 1990, respondent deposited in his trust account $1,700 in settlement proceeds on behalf of Caso. On August 22, 1990, respondent wrote a trust account check to himself for $500 as a fee, and two days later issued another trust account check to himself for $1,400. Those two checks caused the Caso account to be overdrawn by $200 and resulted in the invasion of other client funds already on deposit.

On August 29, 1990, after respondent issued the Caso checks to himself for $500 and $1,400, his trust account balance was $117.59. Subsequently, on September 5, 1990, respondent deposited three checks for legal fees, totalling $1,238, in his trust account. With that deposit, the trust account balance rose to $1,335.59. The next day Caso presented to the bank respondent's trust account check number 1219, dated August 6, 1990. That check represented Caso's share of the proceeds, namely $1,500. That check was dishonored because of insufficient funds. The following day, September 7, 1990, respondent deposited $300 in his trust account to cover the Caso check. When the check was presented again, it was finally honored. The OAE charged respondent with falsely writing the August 6, 1990 date on the check to give the impression that, when it was issued, respondent's trust account contained the *Caso* settlement proceeds.

In its Decision, the DRB noted that

[f]or his part, respondent attributed the inaccuracy of the August 6, 1990 date on the check to a mistake. Respondent asserted that, because it was the beginning of the month, he had erroneously entered the prior month on all the relevant documents. Respondent denied any "clever crafting" attached to the wrong date on the check. Respondent pointed to the fact that,inasmuch as the proceeds had not been obtained until August 14, 1990, it was clear to everyone but him that no check could have been issued on August 6, 1990.

The DRB found that respondent's defenses and claims of inno-
cence in the *Caso* matter also strained credulity. It observed:

> Respondent received $1,700 on behalf of Caso on August 14, 1990. On August 22
> and 24, 1990, respondent issued two checks to himself for $500 and $1,400
> respectively. These disbursements totaled $1,900, against a $1,700 settlement.
> Respondent had to know that he was invading other client funds to the tune of
> $200, even if his claim that he was unaware of the balance in his trust account is to
> be believed. Regardless of whether respondent had a sufficient or insufficient
> balance in the trust account before he received the $1,700, he could not have
> reasonably believed that he had enough funds in the *Caso* account to support a
> disbursement of $1,900. That belief could not have been reasonable because the
> settlement amounted to $1,700 and respondent made the $1,900 withdrawal only
> ten days after the $1,700 deposit. Not much time had elapsed to erase respon-
> dent's memory of the amount of the settlement.

There is another very serious aspect of respondent's handling of
Caso funds. There is no evidence in the record that Caso
authorized respondent to borrow $1,400 from the settlement pro-
ceeds. The letter from Caso that respondent introduced in evi-
dence to establish such authority is silent about a loan.

We conclude that respondent was not authorized to borrow
$1,400 from the Caso account and that his disbursement to himself
of $1,900 against a $1,700 settlement resulted in a knowing
misappropriation of clients' funds. Again, as in the Snyder and
Alongi matters, respondent violated *RPC* 1.15 and *RPC* 8.4(c).

### The Leon–Markov Count

This is the most bizarre matter. On July 13, 1992, the OAE
conducted an initial random audit of respondent's attorney rec-
ords. According to the OAE, that audit disclosed serious deficien-
cies and the OAE warned respondent of those problems. On
April 21, 1993, the OAE conducted a second audit, at which time
the auditor informed respondent that she believed that he was
knowingly misappropriating client funds.

Despite that warning, respondent invaded his trust funds by a
total of $21,000 over the course of the three months immediately
following the second audit. From May 4, 1993 through August 18,
1993, respondent issued a series of eight checks to himself, in

amounts ranging from $500 to $9,000. On September 27, 1993, respondent mailed to the OAE a reconciliation of his attorney records that he had had prepared, which showed a trust account deficiency of $21,916.01 as of August 31, 1993.

Respondent does not dispute that there was a $21,000 shortage in his trust funds. He presents, however, two different explanations for that shortage. Initially, respondent attributed the shortage to the fact that he was holding $20,000 in cash in a safe at his home for a client named Felipe Leon. According to respondent, some time before August 31, 1993, he withdrew the *Leon* funds from his trust account and held those funds at home until he opened a new trust account in September 1993, at which time he deposited the funds in that account. In connection with this explanation, he offered the testimony of his wife, who stated that she kept $18,000 in a rice bag at home until respondent opened a new trust account because she was upset that the bank was charging fees. During this period of time, the old account remained open, and the charges continued. Respondent's wife also had a safe deposit box at that time.

On October 26, 1993, however, when respondent appeared before the Supreme Court to show cause as to why he should not be temporarily suspended from the practice of law, he told the Court that $18,800 of the $21,916.01 shortage in his trust account was due to two withdrawals made in July 1993 at the request of a client, Eleanor Markov, in the amounts of $9,800 and $9,000. The stated reason for Markov's alleged request to remove the funds from the trust account was her fear that the buyer of real estate she had sold in Croatia would be backing out of the deal. Accordingly, respondent continued, Markov was so concerned about the $50,000 that she had wired into his trust account that she had instructed him to "protect" it.

At the hearing before the special master, Markov confirmed respondent's assertions. The OAE countered, however, that respondent fabricated his claim to cover his knowing misappropriation of trust funds. The OAE pointed out that, if respondent

wanted to "protect" the funds, he would have removed the entire $50,000 sum.

Markov ultimately received the $50,000 in two checks, one dated July 7, 1993 for $41,000 and the other dated July 9, 1993 for $9,000. According to the OAE, respondent covered $8,000 of the second check with a $20,000 deposit that he had made to his trust fund on July 7, 1993 for the Leon account. The OAE argued that respondent took $8,000 of Markov's funds and replaced them with Leon's funds.

Indeed, respondent admitted this during the oral argument on his temporary suspension before the Court:

> Basically what this culminated in, there were two withdrawals, 9800 and 9000 in July and, in effect, Mr. Leon's monies were paid out of Miss Markov's monies. Miss Markov's monies were paid out of Mr. Leon's monies and both were in the form of exigency to both clients.

Later in the argument, Mr. Freimark was asked:

> You seemed to imply earlier though that you had knowingly used one client's funds to pay or make up another client's account. Did you say that?
>
> MR. FREIMARK: During the course of the summer, yes, because Miss Markov was calling me from Croatia and she was very urgent about this and again, I represented her family in Hoboken for a number of years. And Mr. Leon was likewise urgent, so, yes, I would say yes in that regard. I think, Justices, that you also in making your decision might keep in mind, my practice does not involve a lot of trust account activity. Maybe I botched up the handling of the funds with regard to the disbursements.
>
> [Oral Argument, Office of Attorney Ethics v. Freimark, October 26, 1993.]

Accepting respondent's explanation, he has clearly admitted the invasion of one client's funds for another client. We do not find, however, respondent's explanations of the Leon–Markov matters to be credible. No financial records substantiate his claims that he withdrew Mrs. Markov's money to protect it. He never offered any explanation as to why the checks were payable to him and were either cashed or deposited in his personal account.

We find that the $21,000 shortage in respondent's trust account is attributable to the eight checks respondent issued to himself between May 4, 1993 and April 18, 1993, in amounts ranging from $500 to $9,000. Those funds were used for respondent's own

personal benefit. Respondent in the Leon–Markov count violated *RPC* 1.15, *RPC* 8.4(c) and *R.* 1:21–6 (failure to maintain required records).

### *Failure to Notify the OAE of the New York Discipline Count*

Respondent, who is also admitted to the New York bar, was publicly censured on January 25, 1994 by the New York disciplinary authorities for releasing escrow funds to a party who was not entitled to such funds. Respondent failed to answer the New York disciplinary proceeding and to notify the OAE that he had been disciplined in New York, as required by *R.* 1:20–14(a)(1). Respondent argued that he believed that he had given the OAE a copy of the order entered in the New York matter. He denied any intent to avoid reporting his discipline to the OAE. Because we determine that respondent should be disbarred for knowing misappropriation, we do not consider this count.

### II

*In re Wilson,* 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979), we held that "disbarment is the only appropriate discipline" for knowing misappropriation of client funds and that its imposition would be "almost invariable." In determining whether an attorney knowingly misappropriates client funds, an attorney's state of mind or motives are largely irrelevant. Knowing misappropriation of client funds

> consists simply of a lawyer taking a client's money entrusted to him, *knowing that it is the client's money and knowing that the client has not authorized the taking.* It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mine, is irrelevant: *it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.*
>
> [*In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986) (emphasis added).]

We have insisted, however, that proof of misappropriation, by itself, is not sufficient to result in disbarment. There must be clear and convincing evidence that an attorney knowingly misappropriated his or her client's funds. *In re Barlow,* 140 *N.J.* 191, 196, 657 *A.*2d 1197 (1995).

Respondent is correct that we have held that shoddy recordkeeping alone does not suffice for a finding of knowing misappropriation. *In re Konopka,* 126 *N.J.* 225, 228, 596 *A.*2d 733 (1991); *In re Librizzi,* 117 *N.J.* 481, 491–92, 569 *A.*2d 257 (1990); and *In re Gallo,* 117 *N.J.* 365, 373, 568 *A.*2d 522 (1989). In *In re Fleischer,* 102 *N.J.* 440, 447, 508 *A.*2d 1115 (1986), however, we held that although poor accounting does not establish a knowing misappropriation, poor accounting is not a *Wilson* defense if evidence indicates knowing misappropriation. *See also In re Skevin,* 104 *N.J.* 476, 486, 517 *A.*2d 852 (1986), *cert. denied,* 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L.Ed.*2d 526 (1987) (holding that a knowing misappropriation may be established by "evidence [that] clearly and convincingly demonstrates that [respondent] knew the invasion was a likely result of his conduct" and that " 'willful blindness satisfies [the] requirement of knowledge' ") (citations omitted); *In re Irizarry,* 141 *N.J.* 189, 194, 661 *A.*2d 275 (1995) ("[W]illfully blind respondent who 'is aware of the highly probable existence of a material fact but does not satisfy himself that it does not in fact exist,' is as culpable as the respondent who knowingly misappropriates. At a minimum, respondent was willfully blind.") (quoting *In re Skevin, supra,* 104 *N.J.* at 486, 517 *A.*2d 852).

This case is similar to *In re Warhaftig,* 106 *N.J.* 529, 524 *A.*2d 398 (1987). There the respondent had suffered a decline in business at the same time he incurred large medical expenses for his wife and son. He, therefore, began prematurely to withdraw predicted fees from funds received for pending real estate deals. He kept meticulous records of all the withdrawn fees and replaced them prior to discovery. No clients were injured. Although he did not feel he was stealing, we found that he had knowingly

misappropriated clients' funds. We have consistently held that "a lawyer's subjective intent, whether it be to 'borrow' or to steal, is irrelevant to the determination of the appropriate discipline in a misappropriation case." *Id.* at 533, 524 *A*.2d 398 (citations omitted).

In this case, the evidence discloses a pattern that respondent, on depositing settlement proceeds into his trust fund, would advance sums to himself, thereby depleting that client's account. Subsequently, he replenished that client's account by invading trust funds received for other clients in unrelated matters. Reviewing respondent's conduct in the most favorable light, respondent borrowed from one client's trust fund, used those funds for his own purpose, and then borrowed money from another client's trust fund to repay the first client.

In mitigation, respondent asserts that no one was injured by his actions and that all his clients received the full amount of money to which they were entitled. In *In re Wilson,* however, *supra,* 81 *N.J.* at 455, 409 *A*.2d 1153, we held that even when the lawyer "borrows" without permission rather than steals, we have invariably imposed disbarment. Misappropriation "includ[es] not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain benefit or benefit therefrom." *Id.* at 455 n. 1, 409 *A*.2d 1153.

"Intent to deprive permanently a client of [his or her] funds ... is not an element of knowing misappropriation. Nor is the intent to repay funds or otherwise make restitution a defense to the charge of knowing misappropriation. A lawyer who uses funds, knowing that the funds belong to a client and that the client has not given permission to invade them, is guilty of knowing misappropriation. The sanction is disbarment."

[*In re Barlow, supra,* 140 *N.J.* at 198–99, 657 *A*.2d 1197].

Respondent further alleges in mitigation that, due to the illness of his wife who had maintained his files and books and the illness of his father, he was unable to maintain the books and records associated with his practice. He also notes that he fully cooperated with the OAE. Those factors are insufficient to warrant any

departure from the *Wilson* rule. *In re Noonan, supra,* 102 *N.J.* at 160, 506 *A.2d* 722.

■  We, therefore, disbar respondent.  Respondent shall reimburse the Disciplinary Oversight Committee for the appropriate administrative costs.

So ordered.

*For disbarment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **LEWIS B. FREIMARK** of **WEST CALDWELL,** who was admitted to the bar of this State in 1980, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately;  and it is further

ORDERED that **LEWIS B. FREIMARK** be and hereby is permanently restrained and enjoined from practicing law;  and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **LEWIS B. FREIMARK**, pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court;  and it is further

ORDERED that **LEWIS B. FREIMARK** comply with *Rule* 1:20–20 dealing with disbarred attorneys;  and it is further

ORDERED that **LEWIS B. FREIMARK** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.