The PEOPLE of the State of Colorado, Complainant,

v.

Thomas F. HASSAN, Respondent.

No. 01PDJ039.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

May 17, 2002.

Opinion issued by Presiding Officer J.D. SNODGRASS and hearing board members BRUCE W. SATTLER and WILLIAM J. MARTINEZ, all members of the bar.

## OPINION AND ORDER IMPOSING SANCTIONS

*SANCTION IMPOSED:* **EIGHTEEN MONTHS SUSPENSION**

This matter was heard on January 17 and 18, 2002, before a hearing panel composed of Bruce W. Sattler, Esq., William J. Martinez, Esq. and J.D. Snodgrass, Esq., presiding (together the "hearing board"). Charles E. Mortimer, Jr., Assistant Regulation Counsel, represented the People of the State of Colorado (the "People"). Bennett S. Aisenberg represented the respondent, Thomas F. Hassan ("Hassan" or "Respondent"), who was also present. The People's exhibits A, B, C, D, F, G, H. H1, I, J, K, L and M were admitted into evidence, and Hassan's exhibits 1 through 10 were also admitted into evidence. Prior to the commencement of the hearing, the parties filed with the Court a written stipulation of facts, signed by each counsel.

The hearing board heard testimony from the People's witnesses Patricia McGinnis, now known as Patricia Chatman, Deborah Ortiz, Michael Spaniola, Steve Gelman and Thomas Hassan and from Hassan's witnesses, Thomas Hassan and Dean Harrison. The parties stipulated on the record to the testimony that would have been given by Martha McHanney if she had been called by the People to testify. The hearing board considered arguments of counsel, the exhibits admitted, assessed the credibility of the witnesses, considered the stipulated testimony of Ms. McHanney and the written stipulation of facts and made the following findings of

fact which were established by clear and convincing evidence.

## I. FINDINGS OF FACT

Thomas F. Hassan has taken and subscribed the oath of admission, was admitted to the bar of this court on September 13, 1985 and is registered upon the official records of the Supreme Court, registration number 14841. Hassan is subject to the jurisdiction of this court in these disciplinary proceedings.

From 1991 to the present time, Respondent has been a solo practitioner representing clients in collection matters and cases involving discrimination and civil rights claims, workers' compensation matters and criminal, real estate and immigration issues. For approximately four years prior to the hearing in this matter, his registered business address has been 4100 East Mississippi Avenue, Suite 802, Denver, Colorado. Prior to 1991, Respondent served for approximately one year as a hearing officer for the State Department of Labor and practiced for a period of time as an in-house lawyer involved in employment and workers' compensation issues for a private corporation. For a time in 1991, the Respondent served as an in-house attorney in a collection agency while starting his own practice. From 1996 through the period of time involved in these matters, the Respondent performed most of the administrative tasks in his law office himself, did his own billing and sent bills when he got around to it.

### A. The McGinnis matter.

In 1999, Patricia McGinnis, now known as Patricia Chatman, retained respondent to represent her in connection with a worker's compensation claim that will be referred to in this opinion as the Innovative Alliance matter or claim. Respondent had provided legal services to McGinnis for nine or ten years. The Respondent represented McGinnis in at least four separate workers' compensation claims, all on a contingency fee basis. The Respondent also provided legal services to McGinnis with respect to a franchise business in which McGinnis was involved called Jani–King of Colorado, Inc ("Jani–King") and with respect to other matters. One of McGinnis' workers' compensation cases also involved Jani–King.

The Respondent had no hourly fee agreement, written or verbal, with McGinnis regarding his services relating to the Jani–King franchise business dispute or any other legal matters and the Respondent never discussed with her the Respondent's hourly rate. The Respondent never sent billing statements to McGinnis for legal services. The billing statements that were prepared by the Respondent and not sent to McGinnis but provided to Debra Ortiz, the investigator from the Office of Attorney Regulation Counsel, were prepared by the Respondent to support his claim that McGinnis was obligated to pay Respondent for legal services performed by him for McGinnis unrelated to the workers' compensation matters. In addition, the Respondent never entered into a written fee agreement with McGinnis with respect to the Innovative Alliance claim and had entered into a written contingency fee agreement in only one of three prior workers' compensation cases. The only written contingent fee agreement entered into between McGinnis and the Respondent was in the first workers' compensation case in which Respondent represented McGinnis.

It was admitted that the Respondent, during the period of his private practice and including the time in which the transactions took place that are covered by these findings, had terrible organization skills and was a "terrible billing person," doing his billing when he got to it. Although the Respondent was clearly capable of providing competent legal services (notwithstanding the Spaniola matter), his lack of organization, haphazard billing practices and lack of understanding or ignorance of the basic professional responsibilities of an attorney with respect to the business aspects of a private practice of law conspired to produce the results outlined in this opinion.

In March 2000, the Respondent obtained a settlement on behalf of McGinnis in the Innovative Alliance matter in the amount of $18,000. The Respondent and McGinnis had a verbal agreement that the Respondent would receive a 20% contingency fee in the

Innovative Alliance claim. At some point the Respondent realized that he did not have a written fee agreement with Ms. McGinnis relating to the Innovative Alliance matter. Respondent prepared a form of contingent fee agreement regarding the Innovative Alliance matter and signed McGinnis' name to that contingent fee agreement, the terms of which provided that the Respondent would receive 20% of the settlement in the Innovative Alliance matter. McGinnis never authorized Respondent to sign her name to the fee agreement. In addition, Respondent did not present to McGinnis a disbursement statement or settlement statement showing disbursement of the Innovative Alliance settlement funds at any time, and McGinnis never signed such a statement.

The settlement check in the Innovative Alliance matter was endorsed by the Respondent and Ms. McGinnis, and deposited in Respondent's trust account on March 31, 2000. Approximately 10 days later, Respondent gave Ms. McGinnis a trust account check in the amount of $10,400.00, representing a portion of her share of the proceeds. Ms. McGinnis questioned Respondent concerning the balance due to her and Respondent indicated that there was some question regarding the settlement check clearing the bank. As soon as he was sure it had cleared he would pay the balance to her.

About twenty days later, Respondent gave McGinnis a second check written on Respondent's trust account in the amount of $1,300.00. Again, McGinnis questioned Respondent concerning the remainder of the money due to her.

The Respondent believed, in his own mind, that he was entitled to be paid by McGinnis for legal services, other than workers' compensation matters, he had performed for McGinnis over the years. Respondent determined that Ms. McGinnis owed him $2700.00 for the hourly legal services he had provided to Ms. McGinnis up to the time of the Innovative Alliance settlement.

Even though Respondent believed McGinnis owed Respondent the $2700 he retained from the Innovative Alliance settlement, several days after delivering the $1,300 check to Ms. McGinnis, Respondent paid McGinnis a check in the amount of $2,700.00. This check was drawn on Respondent's personal account. Respondent's trust account records at the time the third payment to McGinnis was made show that respondent did not have sufficient funds in his trust account to cover a $2,700.00 check to McGinnis.

### The Gelman Matter

In 1999, Respondent represented Steve Gelman in connection with an employment wrongful termination claim. The parties had a contingent fee agreement pursuant to which Respondent was entitled to receive one-third of the gross recovery. Respondent settled Gelman's claim for $2,750.00. Upon receiving the settlement check, on April 19, 2000 the Respondent traveled to Gelman's office where Gelman endorsed the check. No settlement statement or disbursement statement concerning the settlement funds was ever provided to, or signed by, Gelman.

The check was deposited in Respondent's trust account on April 20, 2000. No amount of the settlement was ever paid to Gelman. Pursuant to parties' fee agreement, Gelman was owed two-thirds of the amount collected or $1,834.00 from the settlement proceeds. Respondent agrees the money should be repaid, but has not done so.

Gelman was involved in several business ventures. During the time Respondent was representing Gelman on the wrongful termination matter, Gelman and Respondent had a telephone conversation concerning a trade secret issue relating to Gelman's brother's decision to start a competing business. The Respondent advised Gelman during the telephone conversation that it was not worth pursuing legal action and that it should be settled as a family matter. Although there was no discussion of Respondent providing future legal services concerning the issue, the Respondent prepared a letter dated March 10, 2000 in which the Respondent discussed the trade secret issue and made recommendations to Gelman regarding that matter. This letter was not received by Gelman. The Respondent never had any further discussions with Gelman concerning the substance of the letter, even though he believed Gelman

considered it a serious matter and he met face to face with Gelman on April 19, 2000 and had an opportunity to discuss it and follow up on the matters contained in the letter.

No statements or invoices from the Respondent for the non-contingent legal services provided to Gelman by the Respondent were ever received by Gelman. No statements or invoices for non-contingent legal services were ever sent to Gelman by the Respondent. The fees and work descriptions shown in Respondent's billing statements to Gelman given to Ortiz during the investigation of the Gelman matter relating to the non-contingent matters upon which Respondent offered advice to Gelman, do not correspond to the amounts and client matters stated in the Gelman settlement statement prepared by Respondent and provided to Ortiz.

There was no agreement, written or oral, by which Gelman promised to pay to Respondent attorney fees for any matter other than the wrongful termination claim. At the time the Respondent took the settlement check to Gelman's office on April 19, 2000, the Respondent did not mention to Gelman that he would not be receiving any part of the settlement proceeds as a result of the Respondent's claim to be owed fees for other legal work that Respondent performed for Gelman. However, because he had performed legal services for Gelman, the Respondent believed, in his own mind, that he was entitled to be paid by Gelman for those non-contingent legal services.

### The Spaniola Matter

In January of 2000, Michael Spaniola contacted Respondent concerning a possible employment termination claim regarding his former employer, Morris Communications, Inc. Respondent sent Spaniola a fee agreement at that time. Spaniola spoke by telephone with the Respondent in July of 2000, at which time he decided to retain the Respondent. Spaniola did not return the fee agreement or pay any retainer to the respondent until August of 2000, at which time he returned the signed fee agreement and paid respondent a retainer of $500.00.

In the spring of 2000 and prior to sending to the Respondent the $500.00 retainer check, Spaniola sent to the Respondent two recorded tapes relating to Spaniola's unemployment hearing, to which Respondent listened for approximately two hours. Spaniola also sent to the Respondent a multi-page document prepared by Spaniola as an overview of his employment termination claim. Spaniola and Respondent discussed both the tapes and the overview document.

Respondent deposited the retainer directly into his personal account. Respondent, at the time he deposited Spaniola's retainer into his personal account, believed in his own mind that he had performed in excess of $500.00 worth of legal services for Spaniola and that he was therefore entitled to the funds.

In response to the Office of Attorney Regulation Counsel's inquiry to Respondent concerning the time he spent and the services he performed for Spaniola, Respondent sent billing statements to the Office of Attorney Regulation Counsel purporting to document the fact that Respondent had performed work for Spaniola. While these bills show that Respondent had not performed $500.00 worth of work for Spaniola as of the time Spaniola's retainer check was deposited into Respondent's personal account, these billing statements were manufactured by the Respondent for purposes of the investigation undertaken by the Office of Attorney Regulation Counsel. There is no claim with respect to the Spaniola matter that the Respondent falsified documents provided to the Office of Attorney Regulation Counsel. As set forth above, Spaniola documented that prior to sending the $500 retainer check to the Respondent, the Respondent had performed legal services in the nature of reviewing materials provided to the Respondent by Spaniola.

In connection with his representation of Spaniola, a principal task that Respondent was to perform was to send a demand letter to Spaniola's former employer concerning Spaniola's claim that he was wrongfully discharged. Respondent claimed to have done so. While a demand letter was sent by the Respondent to Spaniola's former employer,

the Respondent failed to take any action on Spaniola's behalf following the mailing of the demand letter and the failure of Spaniola's former employer to respond to the letter. The Respondent never contacted the former employer or Spaniola to determine to whom the demand letter should be addressed. The Respondent failed to provide Spaniola with a copy of the demand letter and failed to respond to Spaniola's numerous telephone inquiries about the status of his claim. Spaniola and Respondent had one final telephone conversation in January of 2001. After that conversation, Spaniola simply stopped hearing from the Respondent.

### The Investigation

In March of 2000, the Office of Attorney Regulation Counsel received two notices from the bank where Respondent's trust account is maintained that Respondent had insufficient funds to cover checks that he had written on his trust account. The Respondent admits that he bounced two checks on his lawyer's trust account in March of 2000. The matter was assigned to Chief Investigator Deborah Ortiz to investigate.

Ortiz engaged in a lengthy process of requesting and obtaining information from Respondent and other sources concerning the activity in Respondent's trust account during the period from March 2000 through September 2000. In connection with her investigation, on June 8, 2000, Ortiz requested a variety of documents from Respondent, including copies of settlement documents and the client ledger sheet involving his client McGinnis. Respondent responded by letter dated June 23, 2000, with which he enclosed a settlement statement concerning Patricia McGinnis and check stub from a settlement check paid on behalf of Ms. McGinnis in a worker's compensation matter. The McGinnis settlement statement stated simply that Respondent settled the McGinnis matter for 18,000.00, took attorney's fees of $3,600.00 and expenses of $150.00 from the settlement, and disbursed to McGinnis $14,250.00. The settlement statement is not signed by McGinnis.

After further investigation, it became apparent to Ortiz that the amounts stated on the settlement did not match the information in bank records subsequently obtained by Ms. Ortiz concerning Respondent's trust account. Specifically, the bank records showed that an amount of $11,700.00, not $14,250.00, was paid to McGinnis from Respondent's trust account. Subsequently, Respondent met with Ms. Ortiz in February of 2001, at which time Respondent gave to Ms. Ortiz an amended settlement statement in the McGinnis matter, a settlement statement concerning Respondent' client Steven Gelman, a fee agreement concerning the McGinnis matter and a disclosure statement concerning the McGinnis matter. The amount disbursed to clients shown on the amended settlement statement for the McGinnis matter now showed that McGinnis received $11,600.00. The amended settlement statement also showed that Respondent paid $3,600.00 in attorney's fees related to the worker's compensation matter to himself, $2,710.00 in attorney's fees related to other matters to himself, and a $150.00 administrative fee to himself from the $18,000.00 settlement proceeds.

The settlement statement in the Gelman matter showed that Respondent had settled a case for Gelman for a gross recovery of $2,750.00, that Respondent had deducted attorney's fees of 33.3% in the amount of $916.33, a $91.00 filing fee and $2,000.00 of other attorney's fees Respondent claimed due from Gelman, leaving a balance due from Gelman to respondent of $256.33. The Gelman settlement statement was not signed by Steve Gelman.

The McGinnis contingent fee agreement purports to be the fee agreement relating to Respondent's representation of Patricia McGinnis in connection with the Innovative Alliance matter. In fact, the Respondent signed McGinnis' name to the fee agreement prior to settlement of the Innovative Alliance matter, and then tendered the fee agreement to Ortiz at her request as the fee agreement between Respondent and McGinnis.

### II. CONCLUSIONS OF LAW

The complaint sets forth nine claims. Claims I, II and III involve the McGinnis matter; claims IV, V and VI relate to the Gelman matter and claims VII, VIII and IX

concern the Spaniola matter. Claims I, IV and VII allege that the Respondent knowingly converted funds belonging to each of the claimants in violation of Colo. RPC 8.4(c). Claims II and V allege that with respect to claimants McGinnis and Gelman respectively, the Respondent submitted falsified documents and in the case of McGinnis, signed the client's name to a fee agreement without the client's authority, all in violation of Colo. RPC 8.1(a) and 8.4(c). Claims III and VI allege that with respect to claimants McGinnis and Gelman respectively, the Respondent failed to issue a written disbursement statement at the time of final disbursement in violation of Colo. RPC 1.5(c) and Rule 4(c), Chapter 23.3 of the Colorado Rules of Civil Procedure, Rules Governing Contingent Fees. Claims VIII and IX allege that with respect to claimant Spaniola, the Respondent violated Colo. RPC 1.3 by neglecting the client's legal matter and failing to diligently pursue prosecution of that matter consistent with the client's request and violated Colo. RPC 1.4(a) by failing to reasonably communicate with the client. The claims will be considered by reference to the violations asserted.

### Claims I, IV and VII

In claims I, IV and VII of the Complaint, complainant alleges that Respondent knowingly converted funds belonging to Patricia McGinnis, now Patricia Chatman, Steve Gelman and Michael Spaniola, respectively, in violation of Colo. RPC 8.4(c). Conversion is defined in *People v. Varallo*, 913 P.2d 1 (Colo.1996), as follows:

> "Knowing misappropriation [for which the lawyer is almost invariably disbarred] consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. *In re Noonan*, 102 N.J. 157, 160, 506 A.2d 722 (1986). Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 N.J. 451, 455 n.1, 409 A.2d 1153 (1979). The motive of the lawyer is irrelevant in determining the appropriate discipline for knowing misappropriation." Moreover, "intent to deprive permanently a client of misappropriated funds, however, is not an element of knowing misappropriation." *In re Barlow*, 140 N.J. 191, 657 A.2d 1197, 1201 (1995).

A "technical conversion," usually warranting suspension rather than disbarment, is a conversion or misappropriation where the complainant either concedes that the misappropriation was negligent, *People v. Dickinson*, 903 P.2d 1132, 1138 (Colo.1995), or it cannot be proven by clear and convincing evidence that the respondent knowingly converted the funds, *People v. Galindo*, 884 P.2d 1109, 1112 (Colo.1994) (board's conclusion that conversion was negligent rather than knowing was supported by the record and would not be overturned); *People v. Wechsler*, 854 P.2d 217, 220–21 (Colo.1993) (supreme court will not overturn hearing board's conclusion that intentional conversion was not established by clear and convincing evidence unless there is no substantial evidence in the record to support conclusion); *People v. McGrath*, 780 P.2d 492, 493 (Colo.1989)("Indeed, if there were not some lingering doubt about whether the respondent engaged in knowing conversion of his client's funds, we would have no hesitation in entering an order of disbarment").

*Varallo*, supra, 11.

In each of the cases here, the Respondent performed legal services for the clients in situations where there was no fee agreement, oral or written, with the client regarding the payment of fees to the Respondent. In each case, the Respondent did perform legal services for the client but there was no expectation on the part of the client that the client would be required to pay the Respondent for those services.

In McGinnis, the Respondent initially retained funds out of the client's portion of a contingent fee recovery in payment for legal services that had been performed by the Respondent over a considerable period of time without being billed to the client. The Respondent returned those funds to McGin-

nis asserting that he was accommodating McGinnis' request that she needed the money the Respondent had retained. In the Gelman matter, the Respondent retained all of the monies obtained from a settlement in a contingent fee case in which the Respondent represented Gelman. In the Spaniola matter, the Respondent placed the client's retainer in his personal account asserting that the money was in payment for services he had performed prior to receipt of the retainer and prior to his receipt of a signed, written fee agreement from Spaniola.[1]

■ The Complainant must prove by clear and convincing evidence that the Respondent's conduct in retaining monies that otherwise belongs to the client in payment of legal fees constitutes a "knowing misappropriation" as opposed to a "technical conversion." C.R.C.P. 251.18(d); *People v. Gray*, 35 P.3d 611 (Colo. PDJ 2001); *Varallo*, supra. *Gray* established a subjective standard for determining whether an attorney's conversion of funds was "intentional" or "technical." If an attorney charged with conversion is convinced of the attorney's entitlement to funds, even if such belief is based upon a misunderstanding of the law, the conversion is "technical." *Gray*, *supra*. Under these circumstances, the hearing board feels constrained by *Gray* and the standard it articulates with respect to the determination of whether one's conversion is intentional or technical.

Here, the Respondent believed, however misguided that belief may have been, that he had the right under the circumstances that existed in each of these cases to retain client monies in payment of legal fees for legal services he had provided to the client. As we have already determined, the Respondent exhibited a fundamental lack of knowledge regarding the proper operation of a private law practice which included specifically the financial relationship between an attorney and a client. In turn, this clear deficiency in understanding the financial relationship with and obligation to his clients lent credibility to the Respondent's stated belief that he had a right to retain client monies in payment of accumulated hourly legal fees.

The Respondent argued that he had the right to be paid for the legal services he provided his clients in these cases because he was entitled to a "retaining lien." We are not required to determine the scope of a "retaining lien" under the circumstances of this case because we have determined that under the facts of these cases, the Respondent was not entitled to be paid for the noncontingent services he performed.

Notwithstanding his belief that he was entitled to be paid for legal services, the misconduct of the Respondent in this case involved the taking of clients' money under circumstances where the clients neither authorized the Respondent to take the clients' monies in payment of Respondent's fees nor did they understand that the Respondent believed that he had a right to take their monies in payment of his fees. Because of his belief that he had the right to apply the client monies to his fees, the Respondent's conduct was negligent rather than knowing. *Gray*, supra. However, the Respondent's conduct still violated Colo. RPC 8.4(c).

### *Claims II and V*

■ Respondent violated Colo. RPC 8.1(a) and 8.4(c) by submitting false documents to the Office of Attorney Regulation Counsel in connection with its investigation of Respondent's conduct. Specifically, in connection with the investigation of the McGinnis matter, Respondent first submitted a settlement statement stating that he paid McGinnis $14,250.00 of the gross recovery. Subsequently, when Deborah Ortiz and Respondent reviewed bank records which disclosed that McGinnis had received $11,700.00 from Respondent's trust account, Respondent submitted an amended settlement statement which reflected that a net disbursement of $11,600.00 had been made to McGinnis and that $2,700.00 had been paid to Respondent from the gross recovery representing hourly services Respondent had performed for McGinnis. Thereafter, McGinnis informed the Office of Attorney Regulation Counsel that in fact she had been paid $14,400.00 by the Respondent, $11,700.00 from the trust

---

**1.** All of these cases arose prior to the effective    date of Colo. RPC 1.5(b).

account and $2,700.00 from Respondent's personal account.

McGinnis never had an agreement to pay Respondent for hourly legal services. The settlement statement and amended settlement statement were documents fabricated by Respondent to explain his use of the McGinnis funds. Neither document matches the transaction information set forth in the parties stipulation of fact or, for that matter, the bills that Respondent claims reflect his work for McGinnis.

Respondent filed Exhibit F with the Presiding Disciplinary Judge. That exhibit purports to explain Respondent's entitlement to the funds he took from the McGinnis and Gelman settlements. Attached to the exhibit are bills which Respondent claims show the hourly work he performed which forms the basis for the additional fees Respondent claimed.

However, neither McGinnis nor Gelman ever received any bills from Respondent. In the face of their testimony, Respondent testified that he had no reason to disbelieve them, and that perhaps he had not mailed the bills to them. By comparison, in Exhibit F, paragraph 4, Respondent states that he presented the final cumulative bill to McGinnis; Respondent does not state that he mailed her the bill. Respondent's testimony serves only to underscore the disorganized manner in which the Respondent conducted his legal practice. While we have concluded that the Respondent did provide non-contingent legal services to both McGinnis and Gelman, we likewise conclude that the billing statements the Respondent prepared, were created by him, "after the fact," and for the purpose of misrepresenting to the Office of Attorney Regulation Counsel that he had properly billed his clients when he had not done so.

Further, at the request of the Office of Attorney Regulation Counsel, Respondent tendered Exhibit L, stating that it was the written fee agreement between himself and McGinnis concerning the Innovative Alliance matter. In fact, upon further investigation, the Office of Attorney Regulation Counsel learned that Respondent had signed McGinnis' name to the fee agreement. Respondent's defense, that he did not mention the fact that he had signed McGinnis' name to the agreement because no one asked him, is disingenuous, at best. Respondent tendered the agreement to the Office of Attorney Regulation Counsel in direct response to Ortiz' request for the written fee agreement between Respondent and his client. Respondent testified that he knew when he signed McGinnis' name to the fee agreement that it was improper, and that he did so prior even to the time when McGinnis endorsed the settlement check. Respondent could have asked McGinnis to sign the fee agreement at that time, but did not. The McGinnis settlement statements and fee agreement contain misrepresentations and were submitted to the Office of Attorney Regulation Counsel with the intention that those documents be accepted as accurately reflecting the facts represented in such documents in connection with its investigation of Respondent's conduct.

Colo. RPC 8.1(a) provides that a lawyer, in connection with a bar disciplinary matter, shall not knowingly make a false statement of material fact. Colo. RPC 8.4(c) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. By submitting the documents described above to the Office of Attorney Regulation Counsel in connection with the McGinnis matter, respondent violated each of these rules. See, *In re Porter*, 980 P.2d 536 (Colo.1999); *People v. Mattox*, 639 P.2d 397 (Colo.1982) (decided under former Code of Professional Responsibility).

In the Gelman matter, Respondent submitted a settlement statement which, he told Ortiz, represented the use of the settlement funds in the Gelman matter. In fact, there is no relationship between the amounts set forth on the Gelman settlement statement and the amounts set forth on the billing statement to Gelman attached to Exhibit F. Nor is there any relationship between those figures and the activity in Respondent's trust account, described in the parties' stipulation of fact. The three documents simply do not match. The hourly fee represented by those client matters do not match the amounts due for the client matters shown on the Gelman settlement statement, Exhibit D. The hear-

ing board concludes that the Gelman settlement statement was created by Respondent solely for the purpose of attempting to explain his conduct and had not been prepared at the time of the Gelman settlement. Providing that settlement statement to Ortiz as part of her investigation constituted a misrepresentation and violated Colo. RPC 8.1(a) and 8.4(c).

### Claims III and VI

◼ Respondent violated Colo. RPC 1.5(c) in both the Gelman and Chatman matters. Clear and convincing evidence establishes that Respondent did not meet all of the requirements of the Colorado Rules Governing Contingent Fees at the time he settled those contingent fee cases. Specifically, Respondent did not issue a written disbursement statement to either client at the time of final disbursement of settlement funds in the Chatman and Gelman matters, in violation of rule 4(c) a the Rules Governing Contingent Fees. Accordingly, respondent violated Colo. RPC 1.5(c) which mandates compliance with the Rules Governing Contingent Fees.

### Claims VIII and IX

◼ There is clear and convincing evidence that the Respondent neglected the Spaniola matter following the failure of Spaniola's former employer to respond to the demand letter and failed to reasonably communicate with Spaniola in violation of Colo. RPC 1.3 and 1.4(a). Respondent offered no testimony concerning what actions, if any, he took to follow up on the missing demand letter. Respondent failed to respond to Spaniola's inquiries regarding the status of his case. The hearing board concludes that there is clear and convincing evidence that Respondent took little or no action to advance Spaniola's legal claims and that Respondent failed to reasonably communicate with Spaniola concerning the substance of those claims in violation of Colo. RPC 1.3 and 1.4(a), respectively.

### III.  ANALYSIS OF DISCIPLINE

◼ The state of mind of the attorney, the degree of harm or potential harm resulting from the misconduct, the impact of the mis-

conduct on the profession, the protection of the public and the mitigating and aggravating factors are the primary considerations evaluated in arriving at the appropriate sanction in this case. When all of these factors are considered, as explained below, the hearing board concludes that a lengthy suspension is the appropriate discipline.

In considering mitigating factors set forth in the ABA Standards, the hearing board has determined that the Respondent had no prior disciplinary record [9.32(a)] and expressed remorse [9.32(*l*)]. In aggravation in accordance with the ABA Standards, the hearing board has determined that the Respondent had a dishonest or selfish motive [9.22(b)]; engaged in a pattern of misconduct [9.22(c)]; engaged in multiple offenses [9.22(d)]; engaged in deceptive practices during the disciplinary process [9.22(f)] and has substantial experience in the practice of law [9.22(i)].

The hearing board has concluded that respondent engaged in three distinct acts of negligent, or technical, conversion. As a result of the Respondent's misguided belief that he was entitled to retain client funds in payment of Respondent's legal fees, Gelman was deprived completely of his share of the settlement proceeds from his wrongful termination claim. Similarly, Spaniola was deprived of his retainer by the respondent. The Respondent returned all of the funds to McGinnis that she was owed. There was in two of the three cases, injury to the clients but not serious injury. Compare ABA Standard 4.61 to 4.62. Under the circumstances, considering the injury and potential injury to the clients and the mitigating and aggravating factors present in this case, the presumed sanction for Respondent's technical conversion of client funds in three separate matters must be a suspension. *People v. Galindo*, 884 P.2d 1109, 1112 (Colo.1994); *People v. Wechsler*, 854 P.2d 217, 223 (Colo. 1993); *People v. Vincent*, 35 P.3d 140 (Colo. PDJ 1999), affirmed Appellate Discipline Commission, January 26, 2000. In all three cases, the respondent was determined to have engaged in negligent or technical conversion of client funds as opposed to intentional conversion, the presumptive sanction for which would have been disbarment. In

*Galindo* and *Wechsler* a suspension of a year and a day was imposed. In *Vincent*, a two year suspension was imposed but on certain conditions, one year and three months of the suspension was stayed and the respondent was instead to be placed on probation for an equal period of time. While *Galindo, Wechsler* and *Vincent* all may be factually distinguished from this case, this hearing board believes these cases provide some guidance with respect to the imposition of discipline in this matter.

The hearing board has also carefully considered the appropriate sanction with respect to the claims involving the Respondent's submission of documents to the Office of Attorney Regulation Counsel that misrepresented the status of the Respondent's billings and charges to his clients in the McGinnis and Gelman cases. ABA *Standards* 6.11 and 6.12 provide:

> 6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.
>
> 6.12: Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceedings.

Even if, as Respondent urges, these standards do not apply to the submission of false documents to the Office of Attorney Regulation Counsel, ABA Standards § 7.2 states: "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system."

Respondent's submission of an agreement and settlement statements to the Office of Attorney Regulation Counsel created for the purpose of attempting to explain his negligent misappropriation of client funds is serious misconduct, justifying a suspension. In *People v. Cardwell*, 2001 WL 1174299, 2001 Colo. Discipl. LEXIS 60, the court made clear that the submission of false evidence violated the most fundamental duty of a officer of the court.

It is helpful to compare and contrast the facts of this case with the facts and circumstances set forth in *Cardwell*, supra. and *People v. Kolbjornsen*, 35 P.3d 181 (Colo. PDJ 1999). In *Cardwell*, the Respondent was suspended for 3 years with 18 months stayed. In *Kolbjornsen*, the Respondent was disbarred. In both cases, the Respondent intentionally misrepresented facts to a court and upon which facts the court entered orders which had to be set aside in subsequent proceedings. In this case, while the hearing board has determined that the billing statements, settlement statements and the disbursement statement in McGinnis were created by the Respondent after the fact for the purpose of supporting the Respondent's position that he was owed money for legal services he had performed for the clients, the Respondent had in fact performed legal services for the clients. He was not, however, entitled to be paid for those services. There was in the eyes of this hearing board, a qualitative difference in the misconduct of the Respondent in this case as compared with the misconduct found in *Cardwell* and *Kolbjornsen* which should result in a lengthy period of suspension but not disbarment.

With regard to respondent's violations of Colo RPC 1.5(c) in both the Gelman and McGinnis matters, ABA Standards § 7.2 applies. Pursuant to the commentary following that section: "suspension is appropriate, for example, when the lawyer does not mislead a client but engages in a pattern of charging excessive or improper fees." In *People v. Peters*, 849 P.2d 51 (Colo.1993) the attorney was suspended for 45 days for charging an excessive fee.

Finally, Respondent's failure to communicate with Spaniola, and his knowing failure to perform services on Spaniola's behalf, are, in and of themselves, grounds for suspension. Pursuant to ABA Standards § 4.42: "suspen-

sion is generally appropriate when: (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client." In this case, Respondent knowingly failed to advance Spaniola's claim, and otherwise failed to communicate with Spaniola. In *People v. Dowhan*, 951 P.2d 905 (Colo.1998) the lawyer received a 45 day suspension for similarly neglecting a child custody matter. Although Dowhan's prior discipline was an aggravating sanction, several mitigating factors were present in that case which are not present in the case at bar. See also, *People v. Masson*, 782 P.2d 335, 336 (Colo.1989).

Considering the findings and conclusions contained herein, the hearing board concludes that a suspension of eighteen months is the appropriate discipline under the circumstances. Further, as a condition of reinstatement, Respondent shall be ordered to make restitution to Mr. Gelman and Mr. Spaniola.

### IV. ORDER

It is hereby Ordered:

1. Respondent, Thomas F. Hassan, attorney registration number 14841, is hereby suspended from the practice of law for eighteen months, effective thirty one (31) days from the date of this order.

2. As conditions of his readmission to the practice of law, Respondent shall reimburse to Mr. Steve Gelman the amount of $1,834.00, with interest at the statutory rate applicable to civil judgments in the State of Colorado, from April 20, 2000 until paid, and Respondent shall reimburse to Mr. Michael Spaniola the amount of $500.00, with interest at the statutory rate applicable to civil judgments in the State of Colorado, from September 1, 2000 until paid.

3. Respondent is ordered to pay the costs of these proceedings; the People shall submit a statement of costs within ten (10) days of the date of this order. The Respondent shall have five (5) days thereafter to submit a response thereto.